**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

**UNITED STATES OF AMERICA**

**v.** **CRIMINAL NO. 2:17-cr-00125**

**ANTOINE E. SKAFF**

# DR. SKAFF'S SENTENCING MEMORANDUM

No man should be judged solely by the worst episode of his life.

In the sixth decade of an extraordinary life, Dr. Tony Skaff stumbled—badly. He has been punished for it, and more punishment lies ahead. This is just. But it is not his whole story. Dr. Skaff has survived horrors unimaginable to most of us, and through unrelenting work, overcome them to realize the American dream. He is much more than just the sum of his mistakes.

He is a war refugee who fled Lebanon's bloody civil war as a 16-year-old boy, leaving his parents behind and seeking sanctuary with relatives in Canada. His oldest brother, who stayed in Lebanon, was kidnapped by Hezbollah in front of their mother and subsequently killed. After reaching Canada with nothing, Dr. Skaff pulled himself up by his bootstraps, washing dishes, busing tables, and working as a waiter. He came to West Virginia for an education, and put himself through school working in restaurants. He built a successful dental practice and a reputation as a skilled, compassionate dentist who would move mountains to care for his patients. He raised a family here—four fine children, all of whom are now pursuing careers in the healing arts. He became a proud American, deeply grateful to a country that would take in a refugee and allow him to share in its promise. As local cardiologist Dr. Steve Lewis put it in a letter to the Court under separate cover,

"Tony is an example of how our great country allows those who seek a better life to achieve it by becoming a U.S. citizen."

Dr. Skaff is a husband of 35 years to a wife whose heart condition has curtailed her activity and threatens to develop into the congestive heart failure that killed her father at a young age. With their children all away from home, she cannot afford to lose him. And he has already paid dearly for his mistakes. His career is ruined, along with his reputation. He has paid the government more than $2.2 million—three times what he gained from his misconduct. He is barred from federal medical programs for 13 years.

In large part because of his personal story, Dr. Skaff's case is exceptional. A review of recent fraud cases, moreover, makes clear that a guidelines sentence for Dr. Skaff would be wildly disproportionate to the punishment that other defendants have received; indeed, fraud similar to Dr. Skaff's often is punished merely by civil sanctions, with the government declining to prosecute altogether. Nor would a guidelines sentence serve the requirements of 18 U.S.C. § 3553(a). Rather, a just and equitable sentence here is either home confinement or a year and a day in prison, to be followed by (or combined with) a requirement to serve the community by providing free care to the needy and educating other health care providers about the consequences of fraud.

## I. An exceptional human story

### A. East Beirut

Dr. Skaff, whose family was Christian, grew up in an apartment in predominantly Christian East Beirut, about a mile from the boundary with predominantly Muslim West Beirut, with his parents and six siblings. His father drove a bus for the government. His mother was a homemaker. In his youth, the city was a crown jewel of the region, nicknamed the Paris of the Middle East for its cultural vibrancy. But in 1975, when Dr. Skaff was 15, Beirut was plunged into sectarian civil war,

with nightmarish results. News accounts document nightly artillery shelling and sniper fire in civilian neighborhoods. Lebanon's population before the war was about 2.5 million. Of that number, as many as 900,000 were displaced from their homes and as many as 250,000 were killed.

Forces in nearby West Beirut shelled Dr. Skaff's neighborhood regularly. He and his siblings recall the attacks vividly: artillery tracers arcing through the night sky; the entire family huddled on the ground floor of their building; shells slamming into the apartments overhead. Dr. Skaff's brother, George, recently returned to Lebanon to show his children the family's old neighborhood. Though some four decades have passed, much of the building remains a bombed-out shell. In the war's early days, Dr. Skaff was hit by shrapnel when a car bomb detonated a few blocks from his building. Hezbollah kidnapped and robbed his father, releasing him because he was too old to be a threat. A sniper shot and wounded Dr. Skaff's sister as she drove to her job at Beirut's airport.

The spring of 1976 brought peace talks, but in late May they broke down. As the Syrian army prepared to enter Lebanon, escalating the conflict, Dr. Skaff's parents finally decided Beirut was too dangerous for him and George to remain there. Dr. Skaff's father paid the owner of a small boat to take Dr. Skaff and George out of the country. Crammed amid other refugees, they fled first to Cyprus, and from there flew to Ottawa, Canada, where relatives had settled. At 16 years old, Dr. Skaff was a war refugee, an ocean away from his family and the only home he had ever known.

His mother and father took a photograph with him and George the day they left Lebanon, not knowing when—or if—they would see them again.



*Skaff family, East Beirut, June 1976*

The boys' older brother, Simon, remained behind, working at the American University in Beirut, on the city's west side. Several years after Dr. Skaff fled for Canada, on what seemed like a calm day in the never-ending war, Simon crossed the Green Line—the boundary between East and West Beirut—to pick up his paycheck at the university. His mother accompanied him. As they crossed the line, they were stopped by Hezbollah fighters. The fighters took Simon, telling Mrs. Skaff they needed to question him but would return him. She waited by the Green Line as day turned to evening and then night. Simon never returned. The war claimed him, as it did hundreds of thousands of others.



*Simon Skaff, left, was later killed by Hezbollah*

**B. The Granada Steakhouse, Ottawa, Ontario**

Dr. Skaff's Ottawa relatives ran a restaurant called the Granada Steakhouse. On his own in a new world, he immediately went to work at the restaurant's most menial job: dishwasher. With time, he worked his way up to busboy and then waiter, learning the restaurant trade while he finished high school and improved his English. After high school, he began engineering classes at the University of Ottawa, paying his own way with a variety of restaurant jobs.



*Dr. Skaff as a young waiter in Ottawa, late 1970s*

**C. West Virginia**

In 1980, a cousin in Charleston told Dr. Skaff about the excellent engineering program at West Virginia Tech; soon afterward, Dr. Skaff enrolled at Tech and moved to West Virginia, which would become his permanent home. By that time experienced in the restaurant business, he quickly found work waiting and busing tables to support himself while he pursued his degree. He joined St. George Orthodox Cathedral in downtown Charleston, the venerable spiritual home to Charleston's large Lebanese community, and there soon met Lee Ann, the woman he would marry in 1982. Although the civil war in Lebanon continued to grind on, Dr. Skaff's mother managed to make the trip to West Virginia for his wedding.



*Wedding day, 1982*

Before long, Dr. Skaff decided to leave engineering and obtain a dental degree at West Virginia University. With money still tight, he continued to work in restaurants while in dental school, and picked up a sideline as a phlebotomist to make ends meet. After dental school, and once his wife, an endocrinologist, completed her residency in Florida, the couple moved back to West Virginia for good. Dr. Skaff took over a Nitro dental practice from a retiring dentist. The practice was deteriorating, but through hard work, Dr. Skaff rebuilt it; when he eventually moved his practice to Kanawha City, most of his patients chose to drive to his new office so they could continue to see him.

**D. Dentistry**

Dr. Skaff's patients speak of him glowingly, revealing a very different dentist than the one the government portrays. In a letter to the Court that will be delivered under separate cover, Simon and Jacqueline Sloane, patients of Dr. Skaff for the past 10 years, praise his "exceptional bed side manner and respect for his patients," and "speak from personal experiences that he would go above and beyond for his patients." Mohanned and Kellie Hassan, also patients, recount a time when Dr. Skaff met them at his office at 1:30 in the morning when Mrs. Hassan was suffering severe pain

from an abscessed tooth. Patient John Hale describes Dr. Skaff as "a skilled professional who is my Dentist, but, also, as a friend who is very kind and has a genuine concern for each individual member of my family and for me." Mr. Hale continues, "[Dr. Skaff] has, on multiple occasions, left his home on his off hours and opened up his office to treat one of us during" emergencies. "[I]n my book," Mr. Hale says, "that makes him a good person with a caring soul, who puts the needs of others before his own." Patient Joe Tagliente recalls the time when Dr. Skaff drove to Boone County to visit his father in a nursing home and take a mold of his mouth for dentures. Longtime patient Peggy Sims tells the Court in a letter than when she was hospitalized for five days on a ventilator, Dr. Skaff visited her in the hospital every day.

John Huddleston, another patient, has seen Dr. Skaff the entire time he has practiced in Charleston and has come to know him personally. Mr. Huddleston says:

> Dr. Skaff and myself seem to have similar thoughts and ideas about the love of our family, our country etc. Dr. Skaff always talked about how thankful he was to be an American citizen and being able to raise his family in a safe environment, earn his citizenship, get an education and work for a living for his family and himself. I feel the same way but thank God I was born in the United States.

**E. Faith**

In his spiritual life, Dr. Skaff has remained a faithful member of St. George, the congregation he joined when he first came to West Virginia. Fellow congregant Marlein Kuttab reports, "He goes to our church, there every week, sharp at the beginning of Mass until the very end of it." Father Olof Scott, St. George's former pastor, describes him as a "faithful and active communicating member[]" of the church, and "sincere and faithful in his efforts to live a dedicated Christian life experience." As Ms. Kuttab describes, "He comes with his wife and his three lovely young daughters and son. This is his family and they are always together, wherever they go. You can always look at him and see that they are a happy, religious, American family."

### F. Family

Indeed, Dr. Skaff's family is his life. He and his wife have raised four children in the same modest Kanawha City home they settled in nearly 30 years ago. The two eldest, Robert, age 27, and Paulina, age 25, are medical students with WVU undergraduate degrees; Paulina is now in her fourth year at Marshall. Brianna, age 20, is a premed student at WVU. Alisha, age 17, graduated from Capital High last summer and has started school at Ohio State, with plans to become a veterinarian. All strong students, they report that Dr. Skaff has been an exemplary father, attending their every performance and extracurricular event, and showering them with affection while gently prodding them to achieve. Brianna, in a letter to the Court, calls him a "kind, loving parent without whom I cannot imagine my life."



*The Skaff family, approximately 2009*

Dr. Skaff is also a devoted brother to his far-flung surviving siblings. Six are still alive, including Dr. Skaff, living in Lebanon, Canada, Cleveland, Charleston, and, until recently, Germany, where his sister Mona was a U.S. Army dentist until the base on which she worked closed. Over all these many years, the six Skaff siblings have convened virtually every weekend on a group call (or nowadays, a Skype session) to keep each other abreast of the events of their families and their lives.

Finally, Dr. Skaff is a loyal husband of 35 years, a role that has become all the more important as his wife has begun to suffer heart problems. As documented in letters from her and her physician (provided under separate cover), she has been diagnosed with diastolic dysfunction, which can cause congestive heart failure, the disease that killed her father at age 56. To prevent her condition from worsening, she must avoid stress and high blood pressure. She cannot lift even moderately heavy objects. She has been forced to scale back her medical practice to half-time, and with all four children away in school, she depends on Dr. Skaff for help around the home.



*The Skaffs, wedding day and 35th anniversary*

## II. The offense and penalties already imposed

Dr. Skaff has pleaded guilty to Medicaid fraud. He faces a sentencing guidelines range of 37 to 46 months. He has also reached a civil settlement with the federal government under which he paid the government more than $2.2 million—three times the government's stipulated loss amount. Under the settlement, he will be excluded from billing any federal medical program for 13 years. He has spent around $70,000 complying with the requirements of a consent order with the Board of Dentistry, and his dental license is suspended.

Dr. Skaff has expressed his deep remorse for his conduct, describing it as "the greatest mistake of [his] life." *See* PSR ¶ 63. He explains that in the beginning, he rationalized his overbilling as a way to be compensated fairly for dental extractions that are complex but fall short of requiring surgery—an often-difficult category of procedure not recognized by Medicaid's billing codes. *Id.* But his overbilling spiraled out of control, and he began doing it routinely. *Id.* Dr. Skaff recognizes, sadly, that "[t]hese mistakes will haunt me for the of my life," and that he "ruined a reputation that took [him] decades to build." *Id.* He is prepared to accept the consequences and recommit to the values with which he was raised. *Id.*

## III. A guidelines sentence would be disproportionate to sentences in other fraud cases.

Many other fraud defendants have engaged in conduct worse than Dr. Skaff's yet received punishments below his guidelines range of 37 to 46 months. Indeed, medical program fraud often goes without criminal prosecution at all, instead punished only by civil penalties. Consider the case of Calloway Laboratories ("Calloway"), which was engaged in the medical laboratory business in West Virginia. In 2015, the United States Attorney's Office filed a civil suit against Calloway, in this district, for knowingly defrauding Medicare and Medicaid out of more than $2.3 million—a fraud amount three times that of Dr. Skaff.[1] The perpetrators at Calloway were using false billing codes to charge for a service that was not covered at all—something of which Dr. Skaff has not been accused.[2] Yet Calloway and its employees were allowed to resolve the case by reaching a civil settlement and writing a check for more than $4.6 million.[3] Faced with a case of medical program fraud substantially more egregious than Dr. Skaff's, the government appears to have prosecuted no one.

[1] *United States v. Calloway Labs., Inc.,* 2:15-cv-16361 (S.D. W. Va. Dec. 22, 2015) (civil complaint at ¶¶ 4-11) (describing Calloway fraud).
[2] *Id.* at ¶ 7.
[3] *Calloway Labs.,* ECF 4-1 at 2 (settlement agreement).

In 2014, in the Northern District of West Virginia, Wheeling cardiologist Devender Batra, M.D., and his company, Belmont Cardiology, paid the federal government $1 million to settle an investigation of false Medicare claims. It does not appear that Batra or anyone else was prosecuted in connection with the false claims.[4] Indeed, Dr. Batra received nothing more than a public reprimand from the Board of Medicine.[5]

Pharmacist Paula Butterfield pleaded guilty to filing a false statement relating to health care matters in 2014. Her Charleston pharmacy, Trivillian's, contemporaneously pleaded guilty to health care fraud and to the introduction of misbranded drugs in to the marketplace.[6] Ms. Butterfield's fraud scheme involved (1) the direction and management of a number of employees; (2) dispensing prescription drugs which were compounded outside of a safe environment; (3) upcoding; (4) dispensing expired medications; and (5) other false billings. Ms. Butterfield paid a seven-figure fine and additional unspecified tax penalties. For a fraud that involved multiple employees and that placed the public at substantial risk by dispensing expired, misbranded, and potentially adulterated prescription drugs, Ms. Butterfield was sentenced to a year and a day.

In the neighboring Eastern District of Kentucky, former Social Security Administration Administrative Law Judge David Daugherty (who was based in this district when he worked as an ALJ) was recently sentenced to four years in prison and ordered to pay more than $90,000,000 in restitution.[7] Daugherty's fraud scheme involved issuing favorable disability benefits decisions to the

---

[4] *Health Care Providers to Pay $1 Million for False Claims, Improper Referrals*, United States Attorney's Office, Northern District of West Virginia (Apr. 17, 2014) (press release), *available at* https://www.justice.gov/usao-ndwv/pr/health-care-providers-pay-1-million-false-claims-improper-referrals (copy attached as Exhibit 1).

[5] *In re: Devender Kumar Batra, M.D.*, Compl. No. 16-90-W (W. Va. Bd. of Med. Jan. 12, 2017) (consent order) (copy attached as Exhibit 2).

[6] *United States v. Butterfield*, 2:14-cr-00278 (S.D.W. Va.); *United States v. Trivillian's Pharmacy*, 2:14-cr-00279 (S.D.W. Va.)

[7] *United States v. Conn et al.*, No. 5:16-cr-0022 (E.D. Ky.); *United States v. Daugherty*, No. 5:17-0066 (E.D. Ky.)

clients of Kentucky attorney Eric Conn, for which Daugherty was paid substantial cash bribes. Daugherty's scheme dwarfed this case, caused Conn to receive more than $7,000,000 in attorney's fees from the SSA, and obligated the government to pay more than $550,000,000 in lifetime benefits to Conn's clients.

To summarize these four recent cases, Calloway (and the employees who carried out its fraud) defrauded Medicare and Medicaid out of more than $2.3 million and got off with only a monetary penalty. Dr. Batra, the Wheeling cardiologist, defrauded Medicare—the amount is not disclosed in documents available to the United States—and got off with a $1 million monetary penalty. Ms. Butterfield, the owner of Trivillian's, admitted to her role in more than $350,000 of fraud, and her pharmacy admitted endangering the public by compounding drugs in unsafe conditions and dispensing expired drugs; she was sentenced to a year and a day in prison. And perhaps most striking, former ALJ Daugherty admitted his role in a scheme that defrauded the federal government of more than *$550 million*, and was sentenced to only 48 months in prison.

Section 3553(a)(6) recognizes the importance of proportionality in sentencing among different defendants. If Dr. Batra and the perpetrators of the Calloway fraud got no prison time at all, then how can it be proportional to sentence Dr. Skaff to 37 to 46 months? If Ms. Butterfield got a year and a day in prison, then how can it be proportional to sentence Dr. Skaff to 37 to 46 months? And if Daugherty got only 48 months for more than *$550 million* in fraud, then how can it possibly be proportional to sentence Dr. Skaff to 37 to 46 months in prison?

**IV. Dr. Skaff's non-criminal prescribing of 5 mg Norcos, in a profession where frequent opioids prescriptions are standard, has no bearing on this case.**

The government insisted that the PSR describe a DEA investigation of Dr. Skaff's prescribing practices—even though that investigation produced no evidence of criminality and was unrelated to the fraud that he admitted in his plea agreement. Ultimately, the investigation found that Dr. Skaff frequently prescribed small doses of 5 mg Norcos—no more than 10 tablets at a

time—when he pulled teeth. It found no evidence that he prescribed Norcos without an accompanying dental procedure or without properly examining patients.

The PSR, influenced by the information that the government selected, paints a picture of Dr. Skaff as an exceptional outlier in the world of dentistry. The truth is the opposite. Dentists routinely prescribe small-dose opioids like the 5 mg Norcos that Dr. Skaff prescribed. In fact, a Harvard study released earlier this year found that 28.2% of initial dental visits in which a patient reported pain resulted in an opioid prescription.[8] The study found that across all medical disciplines, when an initial patient visit for pain resulted in an opioid prescription, nearly half the time the prescription was for more than 7 days. Although Dr. Skaff's prescribing practices may have been careless, they are far from criminal in a discipline where nearly a third of patients complaining of pain are routinely prescribed opioids at least as potent as the small-dose hydrocodone-acetaminophen prescribed by Dr. Skaff. This is particularly true given that Dr. Skaff regularly accepted emergency visits from patients in pain and accepted Medicaid patients, a population with poorer-than-average general dental health. And he rarely if ever wrote prescriptions for more than 10 tablets, in contrast to the high national rate of prescriptions longer than seven days.

**V. Section 3553(a) calls for a sentence substantially below the advisory guidelines range.**

The Court must impose a sentence that is sufficient but not more than necessary to comply with the purposes set forth in § 3553(a), considering, among other things, the history and characteristics of the defendant. Those purposes include a just sentence, general and specific deterrence, and the best possible rehabilitation for the defendant. 18 U.S.C. § 3553(a).

---

[8] Mundkur ML, Rough K, Huybrechts KF, et al. Patterns of opioid initiation at first visits for pain in United States primary care settings. *Pharmacoepidemiol Drug Saf.* 2017;1–9. https://doi.org/10.1002/pds.4322 (copy attached as Exhibit 3).

The Court must consider the sentencing guidelines, but they are no longer mandatory. Rather, they are only one consideration among many—and they are subordinate to the imperative to impose a just sentence.

In this case, a guidelines sentence would not be just. The guidelines are a cookie-cutter formula. They take no account of the life a defendant has lived or the obstacles he has overcome. To the guidelines, a war refugee who came here with nothing and built a good life from scratch, through hard work, is no different from a chronic malefactor who has overcome nothing and spent his life trying to cheat the system. That flies in the face of our fundamental notions of fairness. The full sweep of a person's life must count for something. Slavish devotion to the guidelines in the context of a life such as Dr. Skaff's would undermine justice, not promote it.

Dr. Skaff respectfully submits that an appropriate sentence is a period of home confinement during which he could leave his home only to perform community service in one (or both) of two forms: (1) providing health care for the needy or (2) providing education for other dentists and health care professionals (with travel and all expenses paid for out of his own pocket) about the consequences of fraud in medical practice. This service would be mandatory for a given number of hours per week, to be specified by the Court. Alternatively, if the Court concludes that some period of imprisonment is necessary, Dr. Skaff submits that an appropriate sentence is a year and a day in prison followed by a period of supervised release, a condition of which would be performing service of the form outlined above for a specified number of hours per week.

Numerous considerations support this sentence. It is a just sentence: It takes into account the entire arc of Dr. Skaff's life, not just his recent misconduct. It spares the health of his ailing wife by minimizing the amount of time she must spend at home alone. It accounts for the sanctions that Dr. Skaff had already suffered. And rather than warehousing Dr. Skaff in prison for many useless years, it makes him useful to society.

It is also a sentence that will deter criminal conduct—particularly through the requirement that Dr. Skaff educate other dentists and health care professionals about the consequences of fraud. One can hardly imagine a more effective deterrent than hearing, in person, from a former colleague whose life and practice were ruined by crime. And even without imprisonment, or a protracted term of imprisonment, the consequences that Dr. Skaff has already suffered are more than enough to deter other practitioners: a felony conviction, professional ruin, the loss of millions of dollars, and exclusion from all federal medical programs for 13 years, all at age 57.

Finally, a sentence that requires Dr. Skaff to educate others about his crimes and help provide free health care would do far more to rehabilitate him than would a long prison term. Prison has nothing to offer a defendant like Dr. Skaff. He is not a substance abuser. He is unlikely to benefit from prison educational opportunities. By contrast, the opportunity to serve others for nothing in return, and to help warn them from making the same mistakes he has, would do him immeasurable personal good.

A longer sentence, by contrast, would not serve justice, in large part because it would be so disproportionate to the punishments in the comparison cases highlighted above. Such lack of proportion is the antithesis of justice. A longer sentence is greater than necessary for deterrence. And it would, for reasons explained above, do nothing to help Dr. Skaff rehabilitate and readjust to society. On the contrary, it would undermine that objective, as well.

## VI. Matters relating to sentencing hearing

Dr. Skaff requests that his wife, Dr. Lee Ann Skaff, and his daughter, Paulina Skaff, be permitted to address the Court at the sentencing hearing regarding the impact Dr. Skaff's sentence will have on their family and their lives. He does not intend to call other witnesses except to rebut witnesses that the government may call. Dr. Skaff estimates that the sentencing hearing should require no more than an hour unless the government plans to call witnesses.

## VII. Conclusion

If there were ever a defendant whose life's story cries out for mercy, it is Dr. Tony Skaff. It is not every day that the Court passes judgment on a war refugee who has seen his own countrymen shell his home and kidnap and kill his brother. Rarely if ever will the Court encounter someone who has overcome such horrors to realize the American dream, working hard to build a life here in West Virginia and provide his family the stability he was denied in his youth.

On top of all this, Dr. Skaff's wife is ill and needs him at home. In these circumstances, the Court should not be bound to the sentencing guidelines. It will do the world no good to consign Tony Skaff to years in prison, nor will it serve § 3553(a). It makes no sense for Dr. Skaff to spend years locked up when others go free by writing a check, and when truly staggering fraud can bring a sentence barely above the top of his guidelines range. Let him instead pay his debt by serving the needy and teaching others to avoid his mistakes. There is a possible sentence here that benefits everyone, and Dr. Skaff respectfully requests that the Court choose it.

Respectfully,

**Antoine E. Skaff,**
**By Counsel.**

*/s/ Steven R. Ruby*

Steven R. Ruby (WVSB #10752)
Isaac R. Forman (WVSB #11668)
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
sruby@baileyglasser.com
iforman@baileyglasser.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

**UNITED STATES OF AMERICA**

**v.** **CRIMINAL NO. 2:17-cr-00125**

**ANTOINE E. SKAFF**

**CERTIFICATE OF SERVICE**

I certify that on this 27th day of November 2017, I filed the foregoing **Dr. Skaff's Sentencing Memorandum** using the Court's CM/ECF system with an accompanying motion to seal. Service will be made on opposing counsel by email this same day as follows:

Meredith George Thomas
Assistant United States Attorney
Robert C. Byrd Courthouse
300 Virginia Street East, Suite 4000
Charleston WV 25301
Meredith.Thomas@usdoj.gov

*/s/ Steven R. Ruby*
Steven R. Ruby (WVSB #10752)